IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 10, 2024

## STATE OF TENNESSEE v. FRANK JAMES HASTINGS

**Appeal from the Circuit Court for Lincoln County
Nos. 22-CR-66, 22-CR-67, 22-CR-68    Forest A. Durard, Jr., Judge**

_____

### No. M2023-00247-CCA-R3-CD
_____

Defendant, Frank James Hastings, appeals his effective sentence of twenty-two years related to three cases in which he entered open best interest pleas. On appeal, Defendant argues that his sentence is excessive and that the trial court erred by imposing partial consecutive service and denying alternative sentencing. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Joseph C. Johnson, Fayetteville, Tennessee, for the appellant, Frank James Hastings.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Robert J. Carter, District Attorney General; and Amber L. Sandoval, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural History

On November 15, 2022, Defendant entered best interest pleas in three Lincoln County Circuit Court cases. The State articulated the factual basis for the pleas, which were originally set to be entered as guilty pleas, as follows:

> [In Case No.] 22-CR-66, for victim Linda Gastanaga that occurred in 2020.
> And Ms. Gastanaga hired [Defendant] to build a deck on to her residence.
> After some back and forth a price was agreed upon . . . of $5,500 to construct

the deck. $3,500 of that was to be for materials. Ms. Gastanaga did give that money to [Defendant].

After she aggravated and aggravated [him], he finally did come and drop off some building materials there. And again, after persistence and persistence he finally did start to do some building of a rock patio instead of a deck. There was multiple conversations back and forth with Ms. Gastanaga and [D]efendant. She ended up giving him more money. The total ended up being $7,800, and the materials that were left at the house were not anything that she could even build a deck with herself. So the deck was never completed. And after finally not getting any response from [Defendant], she contacted law enforcement.

Upon examination by the trial court, Defendant gave the following account of events relative to Ms. Gastanaga:

Well, . . . I got incarcerated, that is why I could not go back and finish that job. At the same time I was doing that job I did a job for [another person], and I normally don't get money for the work I am doing until the job is done[,] but I'm pleading guilty to it . . . . The materials was on the job, but pictures show the materials just sitting there, 2 x 4's, 2 x 6's, plywood--

When the trial court interrupted and told Defendant that he did not have to plead guilty, Defendant stated that he wanted to plead guilty even though he did not commit the offenses. The trial court stated that it would not allow him to plead guilty if he thought he was innocent.

The State continued its recitation of the facts:

The second victim in [Case No.] 22-CR-66 is Mr. Marlon [Simmons] . . . . This occurred in 2021. Mr. Simmons purchased a house and land at 110 Walnut Ridge Road in Petersburg. At that time [Defendant] was living in the house, was not paying any rent. The eviction process was started against [Defendant], and once he received notice of that, the door knobs and deadbolts out of the house[,] . . . the well pump and wiring for the well[,] . . . bathtub, shower faucets[,] . . . shower heads[,] . . . , bathroom vanities and sinks[,] . . . bathroom faucets, hot water heater and the wiring [were] stolen. Copper wiring was removed from four separate rooms, five windows were damaged and destroyed. And this resulted in a significant amount of restitution to Mr. Simmons.

- 2 -

The prosecutor noted that the value of the stolen property and property damage was more than $11,000. When the trial court questioned Defendant about the situation with Mr. Simmons, Defendant stated, "That well is not any good, it is dry—." The trial court interrupted and said that it would set the cases on the trial docket.

After a recess, defense counsel announced that Defendant had agreed to enter a best interest plea in each case. The State continued its recitation of the facts:

> Case No. 22-CR-67 . . . occurred December 17, 2020. Initially a traffic stop was made because of an unrestrained driver in the vehicle. The trooper noticed a rifle laying there in the passenger seat and upon running the information found [D]efendant was a convicted felon. So originally he was charged with possession of a weapon by a convicted felon. He was also found to be in possession of Schedule VI and also of drug paraphernalia. After looking at the case for [the] Grand Jury, I do not believe the prior convictions he has would keep him from owning a rifle so we did not indict that.
>
> . . . .
>
> [In Case No.] 22-CR-68, a report was filed with Lincoln County Sheriff's Department by Jenna Stubblefield. She had a 2007 Suzuki Forenza, and this [D]efendant had stolen that Suzuki Forenza. Investigator McDonald talked with Park City Recycling. They reported this [D]efendant brought that vehicle there on May 7, 2022 and provided paperwork there. And those serial numbers matched the paperwork from Ms. Stubblefield. They only keep vehicles for 3 days, so they scrapped her entire vehicle [and] she was not able to get that vehicle back.
>
> Investigator McDonald interviewed [Defendant]. He did waive his *Miranda* [r]ights. He admitted to taking the vehicle. He provided some story about why he actually was entitled to that vehicle. It was a trade for some other vehicle work[,] but Ms. Stubblefield said that is not true.

Defendant averred to the trial court that he understood the consequences of entering a best interest plea and acknowledged that the State could prove its allegations. Defendant agreed that he understood that a sentencing hearing would be held.

The record reflects that Defendant entered best interest pleas to the following offenses:

| Case No. | Count | Offense |
|---|---|---|
| 22-CR-66 | 1 | Theft over $2,500 but less than $10,000 |
| | 3 | Theft $10,000 or more but less than $60,000 |
| | 5 | Vandalism over $2,500 but less than $10,000 |
| 22-CR-67 | 4 | Simple possession of marijuana |
| | 5 | Possession of drug paraphernalia |
| 22-CR-68 | 1 | Theft over $2,500 but less than $10,000 |

Seven additional counts of the indictments were dismissed pursuant to the plea agreements.

At the sentencing hearing, the State noted that Defendant was released on bond in Case No. 22-CR-66 ("Case 66") when the events in Case No. 22-CR-67 ("Case 67") occurred and that Defendant was similarly released on bond in Cases 66 and 67 when the theft in Case No. 22-CR-68 ("Case 68") occurred. The State said that Defendant had nine prior felony convictions, which occurred on five separate dates. The parties had agreed for Defendant to be sentenced as a Range II, multiple offender, and for him to pay $7,800 in restitution to Ms. Gastanaga, $11,900 to Mr. Simmons, and $2,650 to Ms. Stubblefield. The State noted that it was seeking an enhanced Range II sentence, consecutive sentencing, and a sentence involving confinement based upon Defendant's criminal history.

Tennessee Department of Correction Officer Jonathan Williams testified that he composed the presentence report[1] and that Defendant had three pending charges in Case No. DC-2022-002434 in the Madison County, Alabama District Court for possession of drug paraphernalia and reckless endangerment not involving a weapon occurring on April 16, 2022, and a failure to appear occurring on September 14, 2022. Officer Williams stated that one of the Alabama charges was for reckless endangerment but that the police report reflected that Defendant was "simply spinning his tires [i]n some parking lot in his car." The presentence report and copies of judgments exhibited to the hearing reflected the following criminal history:

| Date of Offense | Case Number | Court | Conviction | Classification |
|---|---|---|---|---|
| 4/14/22 | 22-CR-0519 | Lincoln County General Sessions Court | Driving with a revoked license | Class B misdemeanor |
| 1/13/22 | 21-BC-6 | Lincoln County Circuit Court | Worthless checks ($500-$1,000) | Class A misdemeanor |

---

[1] We note that the technical record contains two presentence reports—one dated January 20, 2023, and one dated January 26, 2023. The latter report was received as an exhibit at the sentencing hearing.

| | | | | |
|---|---|---|---|---|
| 10/14/21 | 21-CR-1480 | Lincoln County Circuit Court | Driving with a revoked license | Class B misdemeanor |
| 1/22/13 | 13-10692519 | Huntsville, Alabama Municipal Court | Theft of property | Municipal ordinance violation |
| 10/22/12 | 12-CR-4393 | Lincoln County General Sessions Court | Theft $500 or less | Class A misdemeanor |
| 2/2/10 | S1000060 | Lincoln County Circuit Court | Burglary | Class D felony |
| 2/2/10 | S1000060 | Lincoln County Circuit Court | Theft ($1,000-$10,000) | Class D felony |
| 1/15/10 | S1000060 | Lincoln County Circuit Court | Burglary | Class D felony |
| 1/15/10 | S1000060 | Lincoln County Circuit Court | Theft ($1,000-$10,000) | Class D felony |
| 1/15/10 | S1000061 | Lincoln County Circuit Court | Burglary | Class D felony |
| 1/15/10 | S1000061 | Lincoln County Circuit Court | Theft ($1,000-$10,000) | Class D felony |
| 7/14/08 | S0800101 | Lincoln County Circuit Court | Theft ($1,000-$10,000) | Class D felony |
| 7/11/08 | S0800101 | Lincoln County Circuit Court | Theft ($500-$1,000) | Class E felony |
| 7/10/08 | S0800101 | Lincoln County Circuit Court | Theft $500 or less | Class A misdemeanor |
| 7/8/08 | S0800101 | Lincoln County Circuit Court | Theft $500 or less | Class A misdemeanor |
| 7/3/08 | S0800101 | Lincoln County Circuit Court | Theft $500 or less | Class A misdemeanor |
| 7/2/08 | S0800101 | Lincoln County Circuit Court | Theft ($1,000-$10,000) | Class D felony |

Defendant was also adjudicated delinquent on April 18, 2008, in the Lincoln County Juvenile Court for theft of school property under $500.

Officer Williams testified that Defendant's parole was revoked on February 10, 2021, for incurring a new criminal charge.[2]  Defendant also had two prior probation

---

[2] Although it was not specified, it appears that Defendant was on parole related to Case Nos. S1000061, S1000062, and S0800101 at the time he committed the instant offenses.

revocations. On August 20, 2013, his probation was revoked in Case Nos. S1000061, S1000062, and S0800101, due to his being charged with misdemeanor theft, three counts of burglary, and five other counts of theft. In addition, his misdemeanor probation in Case No. 2012-CR-4393 was revoked on July 11, 2013, due to his failure to obtain employment, pay court costs and fees, and report on six different occasions.

Officer Williams testified that Defendant provided a handwritten statement, which was attached to the presentence report and read as follows:

> I was locked up in Lincoln County TN Jail while [material] on a job I was doing was reported stolen. I could have not done this due to being locked up at the current time of theft. Me and my wife lived in a house for 5 years that was supposed to be ours. The house got sold out from under us[, and] I got charged with theft, vandalism for moving out of a house. The man Marlon Simmons bought the house never setting foot inside the house. Not knowing what he had bought. But there are [multiple] charges I'm being charged with that make no [sense;] there wasn't a hot water heater in the house[,] the 3 windows was already damaged and was already repaired[. T]he carpet [has] been out [of] the house since my daughter was born. I did not commit any crime. I'm accused of a lot of wrong things. I'm charged with theft of a car that I owned and supplied paperwork for.

Officer Williams testified that Defendant attended Lincoln County High School but quit in 2008 because he had been charged with a felony. Defendant obtained his General Education Diploma at a later date and attained an Associate's Degree from Colorado Technical University in 2020. Defendant did not report any physical or mental health issues. Defendant reported using alcohol beginning in 2000 at age ten, and his longest period of sobriety was two years. He also reported having used marijuana until two years before the sentencing hearing, including on the dates of the offenses in the present cases. Officer Williams did not recall Defendant's giving any explanation as to his lack of "any significant work history." Defendant's presentence report questionnaire[3] reflected that he worked as a farmhand at a dairy farm between 2008 and 2012; that he was self-employed as a handyman between 2018 and 2021; and that he worked at Stars Masonry from 2021 to 2022.

Defendant's Strong-R Assessment rated him a low risk to reoffend; Officer Williams noted that the "algorithm" took violent offenses "heavily in consideration, especially within the last six months and throughout the lifetime," and that Defendant had not been convicted of any violent crimes.

---

[3] The presentence report itself listed that Defendant worked for the dairy farm from 2017 until 2018 and that he began work for Stars Masonry in 2009.

On cross-examination, Officer Williams explained that the Strong-R Assessment "takes people who are like . . . [D]efendant, . . . [who have] the prior history like himself. And essentially . . . it groups him with those people, and they all have to have a low rating." He noted that a disclaimer was included "per policy that it's not the defendant's personal risk to re-offend." Officer Williams agreed that the majority of people he interviewed had quit high school or been expelled.

Officer Williams stated that Defendant listed on his questionnaire that he would benefit from receiving food stamps. Defendant reported that he lived with his wife, mother-in-law, and minor daughter. Officer Williams stated that Defendant was one of the "sole breadwinners" for his family. Officer Williams said that Defendant's incarceration "would be a minor hardship, but since the wife is working, I couldn't imagine it would be chaos for the household." He did not know if Defendant's mother-in-law was employed.

Officer Williams stated that he "would imagine" that Defendant served the remainder of his sentences after his parole was revoked in 2021. Officer Williams stated that, to his knowledge, Defendant was not on probation or parole at the time of the sentencing hearing. Officer Williams said that, if Defendant received alternative sentencing, he would be supervised by Officer Williams' office. Officer Williams noted that he did not "personally recommend" alternative sentencing and that he "just put that it's an option" in the presentence report. Officer Williams testified that Defendant violated both state and misdemeanor probation in 2013.

The trial court noted that Defendant's juvenile case was transferred to the Circuit Court in Case No. S0800101 when he was seventeen years old and that, at age thirty, Defendant had nine prior felonies and "a number of" misdemeanors. The court stated that Defendant was about thirty years old at the time of the offenses in this case. The court observed that, while released on bond in Case 66, Defendant was arrested for the offenses in Case 67, and that, while released on bond for Cases 66 and 67, he accumulated another Class D felony theft charge in Case 68. The court added that, "while all this [was] pending," Defendant got into trouble in Madison County, Alabama, on two occasions.

The trial court questioned Officer Williams regarding the Strong-R Assessment's finding that Defendant was at a low risk to reoffend. Officer Williams explained that the assessment's algorithm "looks for charges that . . . cause an impending physical danger to someone else." Officer Williams agreed with the trial court's statements that the assessment's "results are only as credible as what it's programmed for" and that the assessment did not consider "a multitude of non-violent offenses as being a higher risk." When asked what the utility was of designating a person as low risk "when obviously the record does not demonstrate that," Officer Williams stated that, if Defendant received a sentence in confinement, the assessment would be compared with a second Strong-R assessment, and the results would be used for "placement purposes." The trial court noted

that Defendant's record "demonstrate[s] a very concerning and repeated pattern of committing property offenses." Officer Williams "cautiously agree[d]" with the trial court's description of the assessment's rating being "worthless" in cases when an offender had a record of only committing property crimes.

Linda Gastanaga testified that she moved to Tennessee in September 2020, and that in October, she decided to have a deck built on to her home. She advertised the job and met with Defendant on October 20, 2020. Defendant described the type of deck and estimated that it would cost $5,000, with $3,500 needed up front for materials. Ms. Gastanaga stated that Defendant said he could begin work the next day and complete the work within four days. She stated that she gave Defendant the $3,500 retainer and that he asked for additional money "every day."

Ms. Gastanaga testified that, on October 26, Defendant asked for an additional $1,000 for materials. She did not see Defendant again until November 2, when he "begged" for an additional $1,350 for decking boards to complete the project. She said that she did not see Defendant again and that she filed a police report on December 4, 2020. Ms. Gastanaga stated that she paid Defendant $7,850 in total; she noted that she listed the amount as $7,800 in her police report because she paid Defendant fifty dollars in cash, and the record reflects that she paid the remaining amount in several checks.

Ms. Gastanaga testified that she had never been "scammed" or taken advantage of before and that "it happened so quickly." She stated that Defendant seemed like a "very nice man" in need of help. She noted that she was a retired special education teacher on a very limited income and that she had savings "adequate for [her] needs" but that, within two months of moving to Tennessee, $8,000 of her savings was taken.

Ms. Gastanaga testified that, due to Defendant's failure to take her safety into account during the construction project, she fell and got a "significant gash" on her leg, which left a scar. She noted that the fall could have been her fault and that she could have been more careful but that the worksite was unsafe.

On cross-examination, Ms. Gastanaga testified that Defendant seemed like he needed help because he drove a "very disreputable vehicle" and "seemed the sort that needed some help." She noted that the drawings he made of the proposed deck were beautiful and that she hoped to help him obtain additional contractor jobs. Ms. Gastanaga denied that Defendant ever talked to her about his family.

Ms. Gastanaga acknowledged that in her victim impact statement, she stated that she would not want to see an able-bodied person incarcerated. She stated that she would prefer for Defendant to be incarcerated but allowed to perform supervised community service during the day. She emphasized that she "just [didn't] want to see [Defendant]

have free room and board . . . . And not account for what damage he's done emotionally and financially to individuals." She stated that "restitution to me is if he is doing something to better our community."

Marlon Simmons testified that, in July 2020, he bought thirty acres across the road from his farm. He stated that new property "was on two sides of" the home Defendant occupied. Mr. Simmons stated that he spoke to Defendant a couple of times and contacted the property's owner, Andrea Count. Ms. Count told Mr. Simmons that she had been trying unsuccessfully to sell the house, and Mr. Simmons agreed on a price with her and bought it on September 27, 2021.

Mr. Simmons testified that he took his insurance agent to the house on September 28, but that neither Defendant nor his wife would come to the door. After the insurance agent left, Mr. Simmons drove back to his farm and "slipped back down through the woods" to Defendant's house, where Defendant came out a few minutes later. Mr. Simmons handed Defendant an eviction notice and told him that he had fourteen days to vacate the property. Defendant argued that he had thirty days to vacate; Mr. Simmons noted that he felt sorry for Defendant's wife and baby and "let him stay." Mr. Simmons and his wife subsequently met with Defendant and his wife, and Mr. Simmons gave Defendant $500 "to help him on his rent if he would clean the yard up." Defendant did not perform the work.

Mr. Simmons testified that he went to court on October 25, 2021, to evict Defendant and that the court gave Defendant fourteen days to vacate. Mr. Simmons "let it extend" until November 15, then obtained a "writ," and Defendant moved out on November 26, 2021. Mr. Simmons stated that Defendant "carried, stripped all the wire out of the house that he could cut," took the vanity, hot water heater, and well pump, and ripped out the faucets. Mr. Simmons said that five windows in the house were damaged; one window was "shot out" with a shotgun, and another was "shot out" with a rifle. According to Mr. Simmons, Defendant claimed that his friends shot out the windows and that the hot water heater belonged to his friend. Mr. Simmons stated, though, that the amount of dust behind the area in which the water heater was located indicated that it had been there for a long time. When asked how much it cost to repair the damage, Mr. Simmons stated that he had not done it yet because he had been waiting to see what was going to happen with the case.

On cross-examination, Mr. Simmons testified that he tried to help Defendant because Defendant's daughter was about one year old at the time. Mr. Simmons stated that, at the time, Defendant's wife was working for a daycare, and he did not think Defendant had a job. Mr. Simmons said that Defendant told him that he "was up against hard times and he was trying to find work[.]" Mr. Simmons stated that he paid $15,000 for the one-acre property, including the house.

Mr. Simmons testified that, although Defendant had been ordered to pay damages to him in two civil cases, he had received no money. He indicated his doubt that Defendant would pay restitution in the criminal case, regardless of the trial court's orders. Mr. Simmons stated that restitution of $11,900 would not "start to pay" for the damages, which included rewiring the house and redoing the sheet rock. He noted that the house was "totally destroyed."

Lincoln County Sheriff's Investigator Charles Berry testified that he was assigned Mr. Simmons' and Ms. Gastanaga's cases. He stated that, based upon his investigation and his general work experience in Lincoln County, there was a need to deter "this type of behavior." Investigator Berry opined, based upon his thirty-six years in law enforcement, that incarceration would be an effective deterrent to Defendant and other people.

On cross-examination, Investigator Berry testified that he had no evidence that one person's incarceration deterred other people from committing crimes; he said, though, that "working with the criminal element like I have for years, word gets around." He acknowledged that crime did not stop when someone went to prison. Investigator Berry opined, though, that incarceration was the best deterrent currently available.

Investigator Berry testified that he wanted to see Defendant "pay for" his crimes and for the victims to recover what they lost. He agreed that Defendant could not pay the victims back if he was in prison.

On redirect examination, Investigator Berry testified that Defendant had not attempted to contact Ms. Gastanaga, pay her back, or "make good on the construction of the deck." He stated that Defendant had not offered Mr. Simmons "any help at all." Investigator Berry stated that "[w]hen you commit a crime and there's no punishment, . . . you got to keep re-offending and other people are going to do the same thing."

Defendant testified that, after he was evicted from Mr. Simmons' house, he, his wife, and their toddler daughter moved in with his mother-in-law. He paid $650 per month in rent, in addition to a "good portion" of the utilities, "insurance," and telephone bills. He noted that he was "kind of" paying his mother-in-law's rent. Defendant stated that his wife worked full time at a daycare making ten dollars an hour and that his mother-in-law received about $400 per month in disability benefits. He said that he was working with his father at Stars Masonry doing masonry and concrete work. Defendant worked about thirty hours a week and made sixteen dollars an hour. Defendant noted that he had begun working with his brother as well. Defendant said that his daughter's daycare fees were waived because his wife worked there. He agreed that he was the household's breadwinner. Defendant stated that he had $715 "to [his] name" and that the family could use food stamps to have a "little extra money to take care of things."

- 10 -

Defendant testified that, when he was seventeen years old, he served nine months in jail before being released on probation in 2008.  He acknowledged that his probation was revoked in 2013 and that he served three years in confinement.  He agreed that half of his adult life had been spent in confinement and that this explained his "spotty" work history.  He noted, though, that he "usually work[ed] for the same person over a long amount of time."  Defendant stated that he had also worked for a farmer, for whom he did construction work and milked cows.  Defendant acknowledged that he had been ordered to pay restitution in these cases and stated that he could pay $700 that day and was willing to pay every dollar in his possession if needed.  He agreed that he would continue making payments of $100 to $200 per month.  Defendant noted that he also intended to make a larger payment when he received his tax refund.  He acknowledged that failure to pay restitution in a criminal case could be a violation of probation.  He agreed that this was an incentive to make the monthly payments.

Defendant testified that he would be unable to pay restitution if he went to prison, that his household "would drown" without his income, and that his family would not be able to pay the bills or take care of his daughter.  He stated that he was also motivated to make restitution payments in order to see his daughter grow up.  Defendant acknowledged his two prior probation violations and parole revocation.  He noted that the last time he was on state probation was in 2012 or 2013, before he was sent to prison.

On cross-examination, Defendant testified that he had been married since 2018 and that he was thirty-two years old and his wife was twenty-seven years old; he acknowledged that his daughter had been born at the time he committed the offenses in the present cases and that she lived with him at Mr. Simmons' house.

Defendant testified that he paid for a cell phone and that he could pay his bills and restitution.  When asked whether he had paid any restitution yet, Defendant responded that he "was just ordered this last month to pay the restitution and I was told to bring as much money as I could to start paying it up here today."  Defendant stated that he did not pay any restitution after committing the offenses because he "just got guilty not long ago."  He averred that he did not know he was supposed to pay restitution before.

Defendant testified that he had not done anything with the items he took from Mr. Simmons' house but that he was "not sure" where they were.  He agreed that he was not disabled.  Defendant said that he had not used his associate's degree to get a job; he noted that he "used it to open up my own business" but that "things went sour like with Ms. [Gastanaga]'s case" and that he "backed away" from it because he "didn't want any more trouble to occur upon myself[.]"  Defendant stated that he was trying to be a better person and "be better for . . . society[.]"

Defendant testified that it was "up to the tax professional" how much his tax refund would be. He agreed that he and his wife filed jointly and that part of the tax refund was based upon his wife's income tax payments. Defendant said that the money Ms. Gastanaga paid him was not "around" anymore. Similarly, he stated that he did not have any of the money he gained from the sale of Ms. Stubblefield's car.

The trial court noted that, although Defendant qualified as a Range III, persistent offender, the parties had agreed as part of the plea for him to be sentenced as a Range II, multiple offender. The court stated that five qualifying felony convictions remained after merging the ones that occurred in a twenty-four-hour period.

Relative to alternative sentencing, the trial court noted that it did not believe Defendant was suitable. The court found that Defendant was an able-bodied person without any mental issues and that his social history was "not real great." The court found that the circumstances of the offenses and the nature of the criminal conduct were "absolutely reprehensible." The court stated that Defendant took advantage of Ms. Gastanaga and Mr. Simmons, who were each trying to help him, and that Defendant's behavior was "absolutely shameful." Relative to Ms. Stubblefield, the court noted that Defendant's conduct was "inexcusable."

The trial court found that Defendant's criminal history was "atrocious." The court acknowledged that Defendant did not seem to be a violent person but found that he was "one of the most dishonest people I've ever seen come before me." Relative to Defendant's potential for rehabilitation and whether Defendant would abide by the terms of probation, the court found that Defendant had been given "opportunity after opportunity after opportunity" and that he had not taken advantage of them. The court noted, "I don't know how many opportunities one must get before enough is enough, but today it's enough." Relative to the interests of society in being protected from future criminal conduct, the court found that Defendant preyed upon others and that "the record speaks for itself."

Relative to whether measures less restrictive than confinement had frequently or recently been applied unsuccessfully to Defendant, the trial court found that Defendant was on parole when he committed the offenses. Relative to whether a sentence of full probation would unduly depreciate the seriousness of the offenses, the trial court found that the offenses were reprehensible. The court noted the difference between shoplifting and "taking advantage of good people."

Relative to whether confinement was particularly suited to provide an effective deterrent to others, the trial court discussed Investigator Berry's testimony and the court's experience with repeat offenders. The court stated that it did not know if incarceration provided an effective deterrent, noting that it did not think people cared anymore whether they went to prison. The court said that it cared about protecting the public and that, if it

could prevent another crime by incarcerating someone, it was going to do so.  The court denied alternative sentencing, commenting that Defendant had "reached the end of the [c]ourt's grace."

The trial court stated that the sentencing ranges were four to eight years on each Class D felony in Counts 1 and 3 of Case 66 and Count 1 of Case 68; and six to ten years on the Class C felony in Count 3 of Case 66.  The court noted that the maximum sentence for the Class A misdemeanors in Counts 4 and 5 of Case 67 was eleven months, twenty-nine days.

The trial court applied enhancement factor (1), that Defendant had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range, noting that Defendant had three additional felony convictions above the two required to be deemed a Range II offender, as well as six prior Class A misdemeanors—one for passing worthless checks and five for theft of property—and two Class B misdemeanors for driving on a revoked license.  Tenn. Code Ann. § 40-35-114(1) (2022).  The court noted that Defendant's felony convictions were as follows: three for burglary, five for Class D felony theft, and one Class E felony theft.  The court further noted the "compressed period of time in which he's committed . . . 13 felonies in total" and placed "a significant amount of weight" on the factor.

The trial court further applied enhancement factor (8), that Defendant had failed to comply with the conditions of a sentence involving release into the community, and factor (13)(B), that, at the time the offenses were committed, Defendant was released on parole.  Tenn. Code Ann. §§ 40-35-114(8), (13)(B) (2022).  The court stated that, although it would not give Defendant's violating misdemeanor probation "quite as great a weight," the requirements of misdemeanor probation were relatively few, and Defendant did not comply.  The court found that Defendant got into trouble in Alabama while "all this [was] going on" and that Defendant's passing worthless checks and driving on a revoked license while on parole "signifies [D]efendant's lack of being able to conduct himself within the rules of society."

Relative only to Count 3 of Case 66 involving Mr. Simmons' house, the trial court applied enhancement factor (24), that, as a result of the manner in which the theft was committed, the victim suffered significant damage to other property belonging to the victim.  Tenn. Code Ann. § 40-35-114(24) (2022).  The trial court found that the house was "basically stripped for lack of a better term."

The trial court applied mitigating factor (1), that the criminal conduct neither caused nor threatened serious bodily injury, which it gave "some weight, but it'll likely be minimal considering the totality of the circumstances here."  Tenn. Code Ann. § 40-35-113(1) (2022).

- 13 -

Relative to the length of the sentences, the trial court stated that "the fact here is[,] we have three leftover felonies to consider within the range, and then the other criminal history within that." The court noted that "stealing has been a problem for [Defendant] since age 17" and that five of the eight misdemeanors were for "the same activity[.]" The court found that "particularly if you're looking at some of these other factors," top of range sentences were appropriate.

The trial court found that Defendant had a "significant criminal history in a short period of time" from age 17, that the offenses in the present cases occurred between October 2020 and April 2022, and that Defendant was thirty or thirty-one years old at the time of the offenses. The trial court noted that "it's not like the last thing he ever did was 25 or 30 years ago" and that Defendant was on parole at the time the offenses were committed.

Relative to consecutive sentencing, the trial court found that Defendant was an offender whose record of criminal activity was extensive, referring to the reasons it had already articulated regarding the sentences' length, and gave this factor "extensive weight." *See* Tenn. Code Ann. § 40-35-115(b)(2) (2022). The trial court noted the State's argument that Defendant was a professional criminal who knowingly devoted his life to criminal acts as a major source of livelihood, although the court said that, if it "were to apply that," it would give it minimal weight, and it would not "move the needle whatsoever" in its final decision. The court found that Defendant's job history was spotty but that he was also incarcerated for a period of time. *See* Tenn. Code Ann. § 40-35-115(b)(1) (2022).

The trial court announced the following sentences:

| Case No. | Count | Sentence | Manner of Service |
|---|---|---|---|
| 2022-CR-66 | 1 | 8 years | |
| | 3 | 10 years | Concurrent to Count 5; Consecutive to Count 1 |
| | 5 | 8 years | Concurrent to Count 3; Consecutive to Count 1 |
| 2022-CR-67 | 4 | 11 months, 29 days | Concurrent to Case 68, Consecutive to Case 66 |
| | 5 | 11 months, 29 days | Concurrent to Case 68, Consecutive to Case 66 |
| 2022-CR-68 | 1 | 4 years | Concurrent to Case 67, Consecutive to Case 66 |

The trial court initially ordered an eight-year sentence in Case 68; however, after imposing partial consecutive sentencing, it amended the sentence to four years. Defendant's total

effective sentence was twenty-two years.  He timely appealed in each case, and the three cases were consolidated for appeal.

## Analysis

Defendant contends that his sentence was excessive and that the trial court erred by imposing partial consecutive service and denying him alternative sentencing.  The State responds that the trial court acted within its discretion.

### *Length of Sentences*

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2022).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen.  Tenn. Code Ann. § 40-35-210(e) (2020); *State v. Bise*, 380 S.W.3d at 682, 706 (Tenn. 2012).  Although the trial court should consider enhancement and mitigating factors, such factors are advisory only.  *See* Tenn. Code Ann. § 40-35-114 (2020); *see also Bise*, 380 S.W.3d at 698 n. 33; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008).  We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345.  In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'"  *Id.* at 343.  A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706.  "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2020), Sentencing Comm'n Cmts.

In this case, the trial court selected a within-range sentence, detailed its findings on the record, and its decision is presumptively reasonable. *Bise*, 380 S.W.3d at 707. The parties agreed for Defendant to be sentenced as a Range II multiple offender. Theft of property or vandalism of property valued at $2,500 or more but less than $10,000 is a Class D felony and has a sentencing range of four to eight years. Tenn. Code Ann. §§ 39-14-105, 408; 40-35-112(b)(4) (2022). Theft of property valued at $10,000 or more but less than $60,000 is a Class C felony and has a sentencing range of six to ten years. Tenn. Code Ann. §§ 39-14-105; 40-35-112(b)(3). Simple possession of marijuana and possession of drug paraphernalia are Class A misdemeanors with a maximum sentence of eleven months, twenty-nine days. Tenn. Code Ann. §§ 39-17-418(c)(1),-425(a)(2) (2020); 40-35-111(e)(1).

Relative to the length of his sentences, Defendant argues that the trial court applied too much weight to the enhancement factors. However, even if the court's reasoning were faulty, mitigating and enhancement factors are advisory only, and erroneous application of enhancement and mitigating factors is no longer a basis to reverse a sentence. *See* Tenn. Code Ann. § 40-35-114 (2022); *see also Bise*, 380 S.W.3d at 698, 704, 706; *Carter*, 254 S.W.3d at 346.

Here, the trial court properly considered Defendant's history of criminal convictions and behavior; his multiple previous failures to comply with the conditions of release into the community; the fact that he was on parole when he committed the offenses in this case; and the exaggerated degree of damage done to Mr. Simmons' house. These four enhancement factors amply support a maximum in-range sentence; we note that the court reduced its initial sentence in Case 68 and imposed the minimum sentence. The court did not abuse its discretion, and Defendant is not entitled to relief on this basis.

### *Consecutive Sentencing*

Defendant argues that the State failed to prove the factors relied upon by the trial court by a preponderance of the evidence. First, he avers that no evidence was presented at the sentencing hearing to suggest that he is a professional criminal who knowingly devoted his life to criminal acts as a major source of livelihood. Specifically, he notes the proof that he was employed and had work experience, and he states that no proof was presented that he derived income from the criminal activity.

In addition, Defendant argues that his criminal record is not extensive because the majority of his criminal history "was from when he was between the ages of seventeen . . . and nineteen . . . years old," that he had not been charged or convicted of additional felonies for ten years before the offenses in this case, and that he "only had two violations of probation[.]"  The State responds that the court acted within its discretion in ordering partial consecutive sentences and that the court properly determined that Defendant has an extensive criminal history.

In *State v. Pollard*, the Tennessee Supreme Court expanded its holding in *Bise* to trial courts' decisions regarding consecutive sentencing.  432 S.W.3d 851, 859 (Tenn. 2013).  "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal."  *Id.* at 862 (citing Tenn. R. Crim. P. 32(c)(1)).  In this case, the trial court detailed its findings on the record, and its decision is presumptively reasonable.  *Id.*

The statutory factors governing the alignment of sentences for a defendant convicted of multiple offenses are codified at Tennessee Code Annotated section 40-35-115(b), which provides, in pertinent part:

> (b)  The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
>
> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood; [or]
>
> (2)  The defendant is an offender whose record of criminal activity is extensive[.]

Tenn. Code Ann. § 40-35-115(b)(1), (2) (2022).  Any one of the grounds set out in Tennessee Code Annotated section 40-35-115(b) is "a sufficient basis for the imposition of consecutive sentences."  *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)).

Our supreme court recently held that a trial court should consider the following non-exclusive factors when finding that a defendant has an extensive record of criminal activity:

> (1) The amount of criminal activity, often the number of convictions, both currently before the trial court for sentencing and prior convictions or activity;
>
> (2) The time span over which the criminal activity occurred;

(3) The frequency of criminal activity within that time span;

(4) The geographic span over which the criminal activity occurred;

(5) Multiplicity of victims of the criminal activity; and

(6) Any other fact about the defendant or circumstance surrounding the criminal activity or convictions, present or prior, that informs the determination of whether an offender's record of criminal activity was considerable or large in amount, time, space, or scope.

*State v. Perry*, 656 S.W.3d 116, 129 (Tenn. 2022) (footnotes omitted).

We note that, in *Perry*, our supreme court stated that a finding of an extensive criminal history may be based solely upon the offenses for which the defendant is being sentenced. *Id.* at 131 ("[W]e clarify that a defendant need not have prior criminal convictions or activity to qualify as an offender whose record of criminal activity is extensive for purposes of section 40-35-115(b)(2)").

In this case, the January 2023 sentencing hearing occurred just after our supreme court issued the *Perry* opinion. During the sentencing hearing, the trial court noted that Defendant rapidly accumulated several convictions in a short time when he was seventeen years old; the record reflects that Defendant had nine prior felony convictions and seven misdemeanor convictions. In addition, he had just entered pleas for four additional felonies and two Class A misdemeanors which, standing alone, would have been sufficient to find he had an extensive criminal history. These offenses also occurred during a relatively short period of time. The court found that Defendant had a problem with stealing for his entire adult life, as borne out by the high proportion of theft offenses in his criminal history. The court did not abuse its discretion by applying factor (b)(2).

It is unclear from the record that the trial court actually applied factor (b)(1), that Defendant was a professional criminal; the court only noted that *if* it applied the factor, it would give it very little weight. Nevertheless, because the trial court properly found at least one applicable factor supporting consecutive sentencing, the court did not abuse its discretion in ordering partial consecutive sentences. *See Pollard*, 432 S.W.3d at 862. Defendant is not entitled to relief on this basis.

### *Alternative Sentencing*

We review a trial court's decision related to probation or any other alternative sentence under the abuse of discretion standard, accompanied by a presumption of reasonableness, if the decision is based upon the purposes and principles of sentencing

articulated by the court on the record. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (citing *Bise*, 380 S.W.3d at 708).

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *Carter*, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. A court shall consider, but is not bound by, this advisory sentencing guideline." *Id*. (citing Tenn. Code Ann. § 40-35-102(6)(A) (2005).

Defendant was eligible for alternative sentencing because the trial court imposed a sentence of ten years or less, and because theft, vandalism, simple possession of marijuana, and possession of drug paraphernalia are not offenses made statutorily ineligible for probation. Tenn. Code Ann. § 40-35-303(a) (2022). Defendant was not considered a favorable candidate for alternative sentencing because he was being sentenced as a Range II multiple offender. Even though eligible for probation, Defendant had the burden of establishing that he was suitable for probation and "demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *Carter*, 254 S.W.3d at 347 (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)).

Under Tennessee Code Annotated section 40-35-103(1), the trial court should look to the following considerations to determine whether a sentence of confinement is appropriate:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1) (2022).

In this case, the trial court found that Defendant had a problem with stealing for his entire adult life, noting the similarity of many of his convictions, and that he had been given "opportunity after opportunity after opportunity" but had not taken advantage of them. The

court found, and the record supports, that Defendant had twice violated his probation, that his parole was eventually revoked, that he was on parole at the time he committed the offenses in this case, and that he also drove with a revoked license, passed worthless checks, and incurred new pending charges in Alabama while on parole. Tenn. Code Ann. § 40-35-103(1)(C) (2022). We note that Defendant also violated the terms of his pretrial release in Cases 66 and 67. In short, we agree with the court's assessment that Defendant has been unable to "conduct himself within the rules of society."

The trial court also found that full probation would depreciate the seriousness of the offenses, commenting that Defendant's actions were reprehensible and that he preyed upon others. Tenn. Code Ann. § 40-35-103(1)(B) (2022). The trial court did not abuse its discretion in denying an alternative sentence and ordering Defendant to serve his sentences in confinement. Defendant is not entitled to relief on this basis.

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE